I want to hang on just a second. Pardon? Just hold on just a second and let Mr. Page get through there. All right, you can... I please the Court, Neal Blazer for Appellant Ironshore Spclt on the Arbitration Appeal No. 20678 and for the Appellee on the Personal Jurisdiction Appeal of Halliburton 20229. With the Court's permission, I'll reserve five minutes for Appellant rebuttal and I will concentrate my argument on the Arbitration Appeal because if, as we urge the Court, it reverses the District Court's denial of a stay pending arbitration, this Court need not get to HESI's appeal of the personal jurisdiction dismissal that the District Court ordered. Let me ask you about that. I'm glad you said that. I was going to ask you during the course of your argument, what of the state law claims? Would those not, if we agree on the arbitration issue and that's committed to arbitration, are there not other claims that are not subject to that ruling that would then cause us to treat the personal jurisdiction issue anyway? I'm not aware of any, Your Honor. The only claims that I ensure has against HESI are as subrogee of Statoil, the name that's shorted under its policy, and those would arise under the Master Service Agreement between Statoil and HESI. And we, as we urge, step into Statoil's shoes in connection with its rights against HESI under that Master Service Agreement. And this is precisely the main point I was about to segue to. And that is that the District Court exceeded its authority in bypassing contract formation and diving headlong into the maze of contract interpretation in deciding whether I ensure wage subrogation under its policy and therefore was not a subrogee and therefore could not arbitrate with HESI. That it wasn't a party to the arbitration agreement and therefore there is no arbitration agreement for I ensure to pursue. In doing so, the District Court ignored or misunderstood this Court's prescription on the analytical protocol for determining whether a non-signatory to an arbitration agreement can enforce that agreement. It ignored this Court's statements in Kubala and Britannica-U and the seminal Second Circuit decision in Contek upon which the Kubala and Britannica courts relied. Instead of limiting itself to the issue of contract formation, namely whether I ensure status as a subrogee, was sufficiently close to Statoil to essentially make I ensure a, quote, virtual party, unquote, to the arbitration agreement. It dove into the subtleties and the inconsistencies and the complexities of the master service agreement itself and essentially decided the merits of I ensure's indemnification claim against HESI. To get to waiver of subrogation, which was not automatic, the District Court had to go through several hoops. It first had to decide whether the I ensure policy was the type of policy required under the MSA for Statoil to purchase. It then had to decide whether HESI had to be added as an additional insurer to that policy. It then had to decide whether I ensure had to add a waiver of subrogation endorsement that Statoil was required to procure. And most importantly, and this is where, with all due respect, the District Court really went off the rails, it had to be decided whether HESI had an obligation to indemnify I ensure for its $12 million lawsuit paid to Statoil or whether the indemnification ran the other way from Statoil to HESI. This was the gravamen of the dispute between I ensure and HESI and the Court resolved it in HESI's favor on the merits under the guise of figuring out whether I ensure was a subrogate. But not to put too fine a point on it, the Court should have looked at I ensure's status as a subrogate of Statoil, which I don't think is disputed, and stopped right there and should have determined that as a subrogate, both under the policy and Texas common law, there was a sufficiently close relationship, as taught by Fifth Circuit jurisprudence, between I ensure as subrogate and Statoil as subrogore. So I ensure essentially steps into the shoes of Statoil and its rights under the Master Service Agreement. That's where the District Court should have stopped. And why? Because as Petrofac, in Petrofac, this circuit taught that when there is a delegation of authority to the arbitrator to determine its own jurisdiction, as in the AAA Arbitration Clause in the MSA and American Arbitration Association Rule 7A, the Court has no power and has no role in determining the existence, scope, or validity of an arbitration clause. But yet that is exactly what the District Court did. And this was the reversible error that the District Court did and what made the District Courts delve into stage two of the two-step analysis that Britannica and Kubala call for, was that it did this deep analysis under Statoil's and Hesse's rights under the MSA with essentially no factual record. This was all done on the pleadings. It had no record of what happened in the underlying accident at the Isenberth pad in Ohio, who was doing what there, whose equipment was involved, what the sources of pollution were, what Ironshore paid for. The District Court had none of this. So in addition, there are multiple indemnification clauses in the MSA that are extremely complicated, on their face seem to contradict or delete each other, and the District Court was in no position, in the absence of a factual record, to make a merits determination. So it is Ironshore's position that the District Court exceeded its authority by not stopping at contract formation, finding Ironshore as a subrogee. It therefore was close enough to Statoil to step in to choose to arbitrate. Waiver of arbitration, which depended on indemnification and insurance requirements, should have been left for the arbitrator who could have decided it, and hopefully will decide it, on a fully developed factual record. Now, if I may, in the time remaining to me, I'd like to make one other point on arbitration and then spend a few minutes on the personal jurisdiction issue, because these are consolidated appeals and we're given the same amount of time for both. There is another basis the District Court did not treat at all in determining that Ironshore should have been able to arbitrate with HESI under the Massa Service Agreement, and that's equitable estoppel, as enunciated by this court in the Grigson case and then by the Northern District of Texas in the Cold case. Now, admittedly, Ironshore did not expressly raise equitable estoppel as a grounds for being allowed to arbitrate when we presented our motion in the District Court. However, equitable estoppel was mentioned in the Contact case, it's mentioned in the Britannica U case, and so it could have come as no surprise to either the court or to HESI that this was a major issue, and under jurisprudence in this circuit, when we're dealing with a pure question of law and not treating it would lead to a miscarriage of justice, this court can look at the issue of equitable estoppel, even though it was not expressly raised in the court below but at least was inferentially noted in the cases that we cited. And the basic principle of equitable estoppel, which, by the way, is laid out in the recent jolly... I forget the name of the case that HESI recently submitted, is that a party who is a signatory to an arbitration agreement cannot have it both ways. It cannot rely on provisions in the agreement containing the arbitration clause to assert claims or defend claims while at the same time denying the effectiveness and validity in the arbitration clause in the same agreement. And that's exactly what HESI is doing in this case. They are trying to raise the indemnification clauses, the waiver of subrogation clause, the insurance requirements as a bar to iNsure's claims on the merits, but at the same time it is denying the validity or the applicability of the arbitration clause in the same agreement to prevent iNsure from arbitrating those very issues. And it's no surprise... It is not inequitable to require HESI to arbitrate subrogation claims for the iNsure because, as is shown by the waiver of subrogation provisions in the arbitration... in the insurance clause itself, that's 9.1 in the MSA, it talks about subrogation and waiver of subrogation. It was aware that this was a risk and dealt with it specifically in the insurance clause. So it is not inequitable to apply equitable estoppel when cases cited below refer to it. It is one of the elements under Texas state law which provide a basis for a non-signatory to arbitrate with a signatory. And after all, as the cases hold, HESI was a signatory. They should not escape the arbitration clause that they made. In the few minutes remaining, I'm going to shift to some comments on HESI's personal jurisdiction appeal. And they're not necessarily connected points. They may sound random, but each is significant in its own right in our view. First is the issue of whether iNsure... It was foreseeable that iNsure would be held into court by an entity like HESI under its policy. Well, the plain question is, how could iNsure, which issued a policy to Statoil that's named insured, which nowhere names or refers to HESI as an insured under the policy, and that's despite what HESI says in its personal jurisdiction brief on page 3, where it says it's a listed additional insured. It is not. You will not find it mentioned anywhere in the entire policy. Why would iNsure expect HESI, a stranger to the policy, to haul it into a Texas court when the policy has a New York choice of forum clause and a New York choice of law clause? So it was not foreseeable at all that iNsure, which did not deliver the policy or issue the policy in Texas, because to do so would have violated the Texas surplus lines laws, which iNsure observed scrupulously. So foreseeability should not be an issue as a basis for jurisdiction over iNsure. Secondly, in its reply brief, HESI pulls out this icy distribution case, a Fifth Circuit 2003 decision, which it argues is determinative of the issue of jurisdiction because iNsure is equivalent to the asinine of distribution rights in that case. Well, without going into all the details of the very convoluted factual situation in that case that looks like an electrical circuit, the difference is this. This court held that the asinine in that case in taking the assignment from the asinore took on not only all the rights and benefits of the distribution contract the asinore had, but it took on all the burdens and limitations of that contract, too. And since the asinore was subject to Texas jurisdiction, the court merely carried over that susceptibility to Texas jurisdiction to the asinine because essentially the asinine became the asinore. It didn't just step into the shoes. It almost vaporized and turned into the asinore so there was no difference between them. iNsure, on the other hand, has very limited rights. It's a subrogee. Its only right is to recover from a tort feeser for damages that iNsure paid to Statoil under the policy. And in this case, we claim the tort feeser, the responsible party, is HESI. So we may step into the shoes of HESI, but we don't assume its corpus, certainly not for jurisdictional purposes. Another case HESI cited in its reply brief, page 21, is Love and Care under a stream-of-commerce theory iNsure should have expected since it issued a policy to a Texas insured that it's getting the benefit of the Texas economy and therefore it should be subject to jurisdiction. But in that case, the Court pointed out that the stream-of-commerce theory has generally been limited to products liability cases. When a manufacturer sends products into Texas, they can expect to be sued for defects in those products in Texas. That is certainly not the case with an insurance policy that has national implications. I thank you, Your Honor. All right, thank you, sir. You've reserved your rebuttal time. All right, Mr. Street. May it please the Court, Aaron Street, on behalf of Halliburton Energy Services, Inc., which I'll refer to as Halliburton or HESI. I'll be addressing the arbitration appeal as well as any questions related to the sequencing of the appeals, and my colleague, Mr. Little, will then address the personal jurisdiction appeal. Arbitration is fundamentally a matter of contract. A party cannot be compelled to arbitrate with someone it did not agree to arbitrate with. In the Supreme Court's recent decision in Henry Schein, it reiterated the longstanding rule that's been stated in this Court and many courts that it is a question for the Court, not for the arbitrator, to decide whether the litigating parties have entered into an agreement to arbitrate. And that is true even when there is a delegation clause in the arbitration agreement. After all, the delegation clause can only come into play if the Court first finds that the litigating parties agreed to a contract. Here, Ironshore on its face is not a signatory, it is not a party to the master services agreement between Statoil and Halliburton. The only way it can become a party to that contract is if it can successfully subrogate under the terms of the policy and the MSA. That is why the District Court correctly held that it, not an arbitrator, had to decide whether Ironshore successfully subrogated to the policy under the terms of the MSA, had successfully subrogated to the MSA, and therefore became a party and stepped into Statoil's shoes. This Court's decision in ASW Allstate is the most factually on point here. That case was relied upon by the District Court, and it was a case in which Chief Judge Stewart was on the panel back in 1999. That case involved the precise facts that are at issue here in that an insurer sought to invoke an arbitration clause in a contract in which it was not a party, but claimed to be a party by virtue of subrogation. The party resisting subrogation, just as here, said no, the insurer is not a party because they waived subrogation. This Court held that the question of subrogation was a question of contract formation that was assigned to the Court. And this Court ordered the District Court on remand to decide that contract formation question. And on remand, the District Court did so, and it found that the insurer could not subrogate to the agreement, was therefore not a party to the agreement, and consequently denied the motion to compel arbitration in that case. That case is still good law. It's directly on point here to show that in this scenario, a subrogation issue under a contract is a contract formation question for the Court. We would also submit that the Texas Supreme Court's 2018 decision in Jody James Farms, which the parties discussed in the 28J letter, points the way to the analysis here. That case was materially indistinguishable, as here, a non-signatory, sought to be a party to an arbitration agreement, and claimed that the AAA Delegation Clause allowed the arbitrator to decide that question, decide the question of whether it was an agent or a third-party beneficiary or an equitable estoppel beneficiary in that case. And the Texas Supreme Court rejected many of the same arguments that Ironshore makes in its briefing here. At page 632 of that opinion, the Texas Supreme Court held that it doesn't matter whether the party resisting arbitration is a signatory. The Court said, and I quote, even when the party resisting arbitration is a signatory, questions related to the existence of an arbitration agreement with a non-signatory are for the Court. On the same page, the Court rejected another argument that Ironshore has made here, and they made here this morning. They said so long as there's some arbitration agreement, then the Delegation Clause kicks in to send to the arbitrator the question of whether the non-signatory can invoke the clause. The Supreme Court said, and I quote, the question is not whether Jody James Farm agreed to arbitrate with someone, but whether a binding arbitration agreement exists between Jody James and the agency, the third party that was trying to invoke its rights under the contract. And finally, the Texas Supreme Court rejected the argument that you've heard made directly again this morning that the presence of a AAA clause and the AAA clause's reference to validity and existence of a contract somehow delegates the contract formation question to the arbitrator. The Court squarely rejected that, again on the same page, page 632. The Court explained that the analysis of a AAA clause, quote, is necessarily different when a dispute arises between a party to the arbitration agreement and a non-signatory. And the Court went on to explain the Delegation Clause simply never comes into play unless the Court first determines that the litigating parties agreed to that Delegation Clause. And that's consistent with this Court's two-step analysis in cases involving Delegation Clauses. And the key case, I'm going to get to the case they relied on too, but the key case that comes before the Britannia U case is the case DK Joint Ventures. And in that case, the Court squarely held that the question of whether a non-signatory becomes a party to an arbitration agreement is a question for the Court. And on page 317, this is what the Court said. The Courts, quote, must decide in the first instance whether the parties to the litigation entered into any arbitration agreement in the first place. The parties to the litigation. That's Ironshore and Hesse here. They don't have an agreement. The only way Ironshore gets into the agreement is if it can successfully subrogate under the terms of the agreement. That's why Judge Ellison correctly addressed that question rather than deferring it to the arbitrator. And the Court in DK Joint Ventures went on in footnote 9 and said, it doesn't matter that there's a AAA Delegation Clause here because the parties had not entered into a contract at all, much less the contract that contained the Arbitration Clause. To rule for Ironshore in this case and to kick this contract probation question to the arbitrator would create a conflict with the DK Joint Ventures case and a very clear conflict with the Texas Supreme Court. Now, you've heard this morning about this Court's decision in Britannia U. And I submit that that case, of course, must be read consistently with this Court's earlier precedent in DK and that, of course, must be read consistently with the Supreme Court's admonition in Henry Schein and in many other cases that the question of whether the litigating parties agreed to a contract is for the Court. In Britannia U can readily be reconciled with those decisions. In Britannia U, at page 713, the Court, in fact, directly acknowledged this point. The Court said, quote, the first step is contract formation, whether the parties entered into any arbitration agreement at all. And in that case, it was undisputed. And the Court made note of this, that the principal parties in the litigation, Britannia U and Chevron, had agreed to an Arbitration Clause. And so the Court got past the contract formation step, step 1, and it moved to step 2. And it then said, under the terms of the Delegation Clause that Britannia U and Chevron agreed upon, did those parties intend to delegate the questions of whether claims against non-signatories could be arbitrated? We don't have anything like that here. The principal parties in this litigation do not have an agreement to arbitrate unless and until a court decides that Ironshore successfully subrogates into Statoil's rights under the MSA. My friend on the other side said the only question that the Court needed to address in Britannia and the only question that the District Court here should have addressed is whether Ironshore and Statoil have a, quote, sufficiently close relationship. I just looked at the opinion again this morning. I don't believe those words are present in Britannia U. The Court there found that there was a contract between Britannia U and Chevron. And then, and only then, it applied the Delegation Clause to the additional non-signatories. Mr. Street, you have covered a lot already. In a way, it emphasizes my concern about an issue that I think you're saying falls on your plate rather than your other friend at the table, which is, is arbitration a non-merits threshold question? Is this something, there's so much determination, factual and legal, that the Court had to make in order to make its decision and to make it either way. It seems to me that personal jurisdiction absence or presence is very central here. I wish you would deal with the issue of why can this issue be discussed regardless of whether it's resolved, regardless of whether there's personal jurisdiction. Sure. I'm happy to do that, Your Honor. And again, I'm not trying to change who's handling that. If that's your colleague, that's fine. That is squarely on my plate. And the answer is that it is, by definition, not a merits question because it is the only way the Court can resolve whether Ironshore has any rights under the MSA. Of course your principal authorities matter, so it's like venue or forms of nonconvenience that really are deciding where a case and its issues should be resolved. I know you make the analogy, but I'm not sure it's a clean analogy, particularly in light, perhaps, of the comprehensive sort of analysis that you're urging us to review that the district court made on this question without even having necessarily personal jurisdiction. There's no doubt that in some cases the question of arbitrability or the question of who decides contract formation is going to be a relatively straightforward question that's not going to require any consideration of merits-related issues. But in a case where the only way Ironshore, which is a stranger to this agreement otherwise, where that's the scenario where they have to show subrogation, there must be consideration of whether they actually subrogated. And let me make two additional points on that. First of all, this Court's decision in the ASW Allstate case is directly on point there. The Court there said that the subrogation question is one of contract formation that is for the Court. And regardless of whether that will sometimes require consideration of the merits. And the other point I would make on this is it's not that unusual that the Court has to deal with threshold non-merits issues that sometimes require some overlap with the merits. I think of the Rule 23 context in particular. In the Walmart case, of course, the Court said the Court is really resolving predominance and commonality of issues. But to do that, sometimes the Court has to resolve or touch upon merits issues. And so that's what we have here. Sure, we have an overlap between the subrogation question and the merits. But the District Court wasn't going off on a lark and resolving merits issues. It did that only because Ironshore said, hey, we want to become a party to this contract that we're not a party to. And the only way you can do that is to look at whether they are in fact subrogated. And so let me turn to that question for a second. And I think it's a very quick three-point tour through the provisions of the agreement. And I would suggest that this tour helps to answer Judge Southwick's question in that there were in fact no, there are no disputed fact questions that were required to resolve these contractual interpretation issues. And I think that will become clear when we quickly step through the provisions. First of all, the insurance policy, the same provision of the insurance policy that grants Ironshore subrogation rights also holds that they waive subrogation to the extent required by written contract. So they're just two sides of the same coin. So then you look at the written contract, which is the MSA, Section 9.1. And that says Statoil will cause its insurer to waive subrogation against HESI for liabilities Statoil assumes. And so the way we know whether they're subrogated is if they've paid out on a claim for which Statoil did not assume liability. If Statoil assumed liability for these claims that they paid out for, then they're not subrogated. They're not a party to the agreement. They can't invoke the arbitration clause. So then we look to see whether Statoil assumed the liability for this claim. And it's, in our view, very clear, and it's why Judge Ellison had no trouble finding the relevant provision here. It was Section 12.8. And Section 12.8 says, and I'm quoting, subject to Articles 12.1 and 12.4, but notwithstanding anything else contained in this master agreement, so this is what I call sort of a supercharged provision, the company, Statoil shall release, defend, hold harmless, and indemnify HESI against any claims resulting from any fire. So it is a very broad claim and provision. Any claims resulting from any fire, and that overrides everything else in the agreement except 12.1. Now, all you have to do is look at the undisputed facts in the record to determine that Ironshore paid out for any claim related to any fire, and that it was for Statoil's loss, not HESI's loss. So 12.1 doesn't apply. And if I could beg the Court's indulgence to take 30 seconds to point out the undisputed record sites that show that what Ironshore paid out for was any claim resulting from any fire that caused Statoil's losses. All you have to do is look at page 70 through 71 in the record in the arbitration appeal. And there, that is Ironshore's demand. So this is Ironshore's own words of what the claim they paid out to Statoil on. And they said, quote, fire, fire erupted. Can I just read this one sentence? Madam Clerk, give Mr. Street an additional two minutes to make this. I don't want to rush through this. Give him an additional two minutes to make the point. I'll give you your two on the back end if you need it. But I'd prefer not to rush through the point. Thank you. Yes, and this really is last point. But since you kindly gave me two minutes, I will make sure I make it fully and carefully. So this is page 70, 71 in the appellate record. Ironshore's demand letter. This is what they say. Fire erupted at a HESI blender. Eventually engulfed the entire well pad and its contents and resulted in damage and loss to Statoil. That's what Ironshore says it paid Statoil for. It's a claim arising out of a fire and it's for Statoil's loss. Therefore, the knock for knock provision that would bar HESI from recovering for HESI's loss doesn't apply here. So that's the undisputed words of Ironshore. Judge Ellison, to the extent there's a concern about going into the merits, I don't think that's, I think that's inherent in this question. But to the extent there's any concern on these facts, they were undisputed that this provision applied. You could also look, I'll give two quick more record sites at 488 in the record and 501. Those are Ironshore's pleadings in a separate related but separate insurance dispute proceeding with HESI's other insurers and there Ironshore explains that this claim that they paid on arose out of a fire and it elaborates a little bit more on what Statoil's losses were. Statoil's losses were it became liable for environmental cleanup to the EPA to the tune of several million dollars and it had to do well remediation of its own property and its own well. So it seems to me the only argument that the other side has to this is they want to apply the 12.10 pollution and contamination provision but that is expressly overridden by the fire clause. The fire clause is notwithstanding the 12.10 and then they want to apply the knock for knock provision in 12.1 but that only applies to Halliburton's losses. That's the reading that's consistent with industry practice and it's the reading that's most consistent with the plain language of that provision. Thank you, Your Honor. May it please the Court. Prior to getting in my broader personal jurisdiction argument, let me answer the question that Judge Southwick asked my colleague. Judge Southwick, to the extent you were concerned about whether the trial court had the power to decide arbitration, I think that's an easy case. As Judge Elson said in the personal jurisdiction opinion, Ironshore asked him to decide the arbitration question first. That is a consent to personal jurisdiction for purposes of the arbitration ruling. So I don't think there's really any real dispute that Judge Elson at least had personal jurisdiction to decide the arbitration issue. Now getting into the broader personal jurisdiction issues, the story of this case really reveals Ironshore's substantial related contacts with Texas. It all began when Ironshore reached into Texas to sell an insurance policy to Statoil, a Texas resident. Then Ironshore voluntarily invoked the power of Texas courts to litigate related disputes between it, Statoil, and other insurers. Then it asserted rights under a contract with a Texas choice of law and choice of forum clause, that's the MSA. And when it did that, Ironshore engaged Texas counsel to send a demand letter under that Texas contract to Hesse, a Texas resident. And Ironshore even sought to litigate those disputes with Hesse in that same Texas proceeding. Now when you consider all of these together, as you must do under this court's precedence, those contacts constitute purposeful availment. Now Ironshore hasn't really engaged at this level. It has employed a kind of divide and conquer strategy, looking at each of these contacts alone, trying to isolate it from the rest and saying this or that contact by itself wouldn't result in personal jurisdiction. Now Hesse has argued and continues to maintain that most, if not all of those contacts alone would be enough for personal jurisdiction. But this court doesn't have to reach any of those issues. Its job is much easier. It only has to look at this rich web of contacts that really permeate the entire history of the events leading up to this case and hold that together, that is enough for personal jurisdiction. Now I'd like to talk about a few of these contacts in a little greater detail. First, Ironshore has asserted rights under the MSA. Now it's trying to step into Saddle's shoes to get the benefits of that contract, but it's trying to avoid all the jurisdictional contacts baked into that contract. And what I mean by the context of the contract is that if you look at the MSA, it has a Texas choice of law clause and a Texas choice of form clause. So under this court's precedence, a contract with the Texas choice of law and Texas choice of form clause is enough for personal jurisdiction for claims arising out of that contract. I don't think my friend on the other side disputes that point. The IC distributors case came up in his argument and I think that is close to directly on point here. There it was an assignee of a trademark and this court held that when an assignee acquires not only the rights and priorities of the contract, but also the jurisdictional contacts of any contracts that burdened those rights. And there the jurisdictional contacts of that contract, it was a licensing agreement that gave exclusive rights to use the mark in Louisiana or Texas or one of those states within this court's jurisdiction. So it was again, it was a contact baked into the contract, not just any particular jurisdictional contact that the assigneur had. And it's the same here because Ironshore is trying to be a subrogate of Satterall, step into its shoes. To assert rights under this MSA, it has to take those contacts with it. If I could talk briefly about one other of the groups of contacts in the sport of this case, if you look at Ironshore's Texas litigation, Ironshore voluntarily came to Texas, made the choice to litigate its related disputes in Texas between Ed Satterall and the other insurers. And to be clear, Ironshore's not being purely defensive there. It's making claims against the other insurers as well, both on offense and defense. And the Interpol case out of the First Circuit and the Metrano case out of the Fourth Circuit, both arose in very similar circumstances and they voluntarily chooses to make offensive claims in a court, then that constitutes purposeful availment and subject it to jurisdiction for all other claims arising out of or relating to that case, which this is. Thank you. Thank you, sir. All right. Back to you, Mr. Glazer. I'd like to home in on one statement that my learned adversary made. He kind of skated by with it, but it's significant. What he said was that the district court in this case had to decide if Ironshore made a successful subrogation claim against the HESI. And the recording will show he said words to that effect. That is exactly the point here. That is exactly what the district court did not have authority to decide the merits of Ironshore's subrogation claim and whether it could bring the subrogation claim. Now, my adversary didn't mention at all the line of cases that talked about the closeness of a relationship between the non-signatory and the signatory. And clearly under Texas law, there is such a close relationship for a subrogee and a subrogor. And we agree that when it comes to contract formation, that's what the court, not the arbitrator, has to decide, whether the party, the person or entity seeking to compel arbitration is a, quote, party, unquote, to an arbitration agreement or, in Ironshore's case, a virtual party. And this has not been addressed. Once that has been established, you don't go further into the merits of whether subrogation has been waived, whether it's a successful subrogation claim or any of that. That's step two with the delegation clause here. That is for the arbitrator to decide. If the subrogation waiver applied, the arbitrator decides that. That's what the delegation clause does. The other misstatement that my learned adversary made is that the issue of indemnification and waiver of subrogation is undisputed. It's completely disputed. There are, as the district court observed, seemingly contradictory indemnification clauses. And my adversary pointed to a statement taken out of context in a demand letter by Texas counsel. But the fact of the matter is, had there been a full factual record developed, the court, or in this case the arbitrator, would see that Ironshore did not pay for a fire. We have a pollution policy, not a fire policy. We paid $12 million because Statoil entered into an administrative order on consent with the EPA to clean up the pollution from the runoff from the site and from a well that ran out of control. So the issue of indemnification is hotly disputed, and that's why you need an arbitrator to decide it on a full record, and that governs whether subrogation is waived. But there's another issue that's hotly disputed, and that is whether Ironshore, or rather Statoil, was required to even purchase a pollution policy like the one in question in this case. And if you look at enclosure 2, which is at page 265 of the record, and that is a list of the minimum insurance coverage to be maintained by contractor group, that is by HESI. And if you read section 9.1 in the MSA, Statoil was supposed to get the same insurance that HESI was supposed to get. It talks about contractual liability, property damage, personal injury products, sudden and accidental pollution and contamination, etc. It does not mention site pollution legal liability coverage. And so there's a question as to whether this policy should be in play at all in terms of waiver or subrogation. So these are just among the legion of disputed factual and legal issues that go to the merits of Ironshore claim that should have been left to the arbitrator. As far as the ASW cases go, they're inapplicable here. First of all, they preceded Petrofac, so the whole issue of delegation of authority never came up there. Secondly, that was an easy one for a court to decide on the contract formation basis because the subro clause on its face was inapplicable. It basically said we have subrogation unless a property insurer pays a claim under the policy, which is exactly what happened there, end of memo. So there wasn't this long, drawn out, deep analysis that the district court did, both on insurance requirements, subrogation waiver, and indemnification without any kind of record in front of it other than a couple of letters and a complaint. My adversary also mentioned DK Joint Ventures as a case that stands for the proposition it advances, but that case only proves Ironshore's point. The court, quite frankly and clearly, in the contract formation stage one, looked to see if there was a closeness of relationship between the non-signatories whom the signatory was trying to compel arbitration against. Not the other way around, as in our case, whether the non-signatories had a close relationship with the signatory to the arbitration clause. The signatory was a corporation. The non-signatories against whom the other side was trying to enforce arbitration were corporate officers of the corporation, and the court simply held that they are now bound by the corporation's arbitration agreement. They're agents of the corporation. There is no close relationship which would allow you to put the corporate officers in the shoes of the signatory, and so the court did exactly what Kubala and Britannia U in contact required it to do. It looked at whether there was a, quote, virtual party, unquote, to the arbitration agreement, and there wasn't, rightly so. Now, just a couple of issues on jurisdiction in the remaining time for me. I, in short, never consented to the court's personal or subject matter jurisdiction to decide the arbitration issue. We cited SINOCHEM, which the Supreme Court clearly held a court can decide not to give audience to a case, in other words, dismiss a case on procedural grounds without deciding on jurisdiction, and that's exactly what the court did here. It determined that arbitrability was a procedural issue. It didn't have to decide jurisdiction, but it did not deny audience. It gave audience, and that's why they're incorrect. Thank you. Thank you, Mr. Glazen, Mr. Street, Ms. Little. It's a robust case. We appreciate the briefing and the argument and the help with it. The case will be submitted and we'll unravel it as best we can. Before we call up the third case, as I said, just a little short recess for about 10 minutes. Counsel can come on up if you want to.